UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| EDWARD CLARK,<br><br>          Plaintiff,<br><br>     vs.<br><br>UNUM GROUP and THE PAUL REVERE<br>LIFE INSURANCE COMPANY,<br><br>          Defendants. | 4:20-CV-04013-KES<br><br><br>MEMORANDUM OPINION AND ORDER |

Plaintiff, Edward Clark, filed suit against Unum Group and The Paul Revere Life Insurance Company alleging claims of bad faith and aiding and abetting bad faith, breach of contract and interference with contract, and alternative claims under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. ch. 18. Docket 1.

**BACKGROUND**

The parties' dispute concerns a long-term disability policy issued by Paul Revere to Clark in 2001 while Clark was employed by Sanford Health Systems.[1] Docket 18 ¶¶ 1-2. In October 2015, Clark suffered a bilateral pulmonary embolism and began to regularly experience fatigue and shortness of breath. Docket 1 ¶¶ 29-31, 39. His condition led to difficulty maintaining his prior occupation as an acute care physician, and he submitted a claim for benefits under the long-term disability policy. *Id.* ¶¶ 44, 46. Because of issues settling his claim, Clark filed suit against Paul Revere

---

[1] Sanford Health Systems was known as Sioux Valley Health Systems when Clark began working there in 2001. Docket 18 at 2 n.1. To reduce the possibility of confusion, the court will refer to Clark's employer as Sanford Health Systems, regardless of what it was called at the time.

and Unum alleging state-law bad faith and breach of contract claims and alternative claims under ERISA. *Id.* ¶¶ 83-113.

Defendants moved for summary judgment on Clark's state-law claims, asserting they are preempted by ERISA. Docket 11 at 6-16. The parties dispute nearly every fact relating to whether the state-law claims are preempted by ERISA. *See* Docket 18. The court denied defendants' motion for partial summary judgment because there were genuine disputes of material fact regarding the application of ERISA to Clark's policy. Docket 27. In the order denying defendants' motion for partial summary judgment, the court ordered an evidentiary hearing to resolve the factual issues regarding the application of ERISA in this case. *Id.* at 12. The evidentiary hearing was held on March 21, 2022. Docket 64. The court received 28 exhibits and heard testimony from Dina Fournier[2] at the evidentiary hearing. *See* Dockets 65, 69.

## DISCUSSION

ERISA's civil enforcement scheme preempts state-law causes of action in determining rights under an ERISA plan. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52-55 (1987). Thus, plaintiffs are precluded from bringing state-law claims regarding plans governed by ERISA. *See id.* "The existence of an ERISA plan is a mixed question of fact and law . . . ." *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 256 (8th Cir. 1994).

Courts perform a two-step analysis to determine whether a plan is governed by ERISA. *Berry v. Provident Life & Accident Ins. Co.*, No. 4:05-cv-04139-KES, 2007 WL 9772747, at *2 (D.S.D. Mar. 6, 2007). First, the court determines whether the plan falls within ERISA's safe-harbor provision, 29 C.F.R. § 2510.3-1(j). If a plan does not

---

[2] Fournier is the lead individual disability insurance business consultant for Unum Group. Docket 69 at 9.

fall within the safe-harbor provision, the court must determine whether the scheme at issue qualifies as an "employee benefit plan" that was "established or maintained" by an employer. *Berry*, 2007 WL 9772747, at *2 (citing *Nw. Airlines, Inc. v. Fed. Ins. Co.*, 32 F.3d 349, 354 (8th Cir. 1994)). "Because the claim of ERISA preemption is a defense, the burden is on the defendant to establish the safe harbor regulation is inapplicable." *Berry v. Provident Life & Accident Ins. Co*, 2007 WL 1795837, at *4 (D.S.D. June 19, 2007) (cleaned up) (quoting *Merrick v. Nw. Mut. Life Ins. Co.*, 2001 WL 34152095, at *7 (N.D. Iowa 2001)); *see also Ehrenspeck v. Spear, Leeds & Kellog*, 389 F. Supp. 2d 485, 489-90 (S.D.N.Y. 2005).

## I.    Whether ERISA's Safe-Harbor Provision Applies to Clark's Plan

First, the court addresses whether Clark's plan falls under ERISA's safe-harbor provision, 29 C.F.R. § 2510.3-1(j). The safe-harbor provision states that ERISA does not govern a group or group-type insurance plan offered by an insurer to employees or members when:

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j). For the safe-harbor provision to apply to a plan, it must meet all four of the provision's requirements. *Dam v. Life Ins. Co. of N. Am.*, 206 F. App'x 626, 627 (8th Cir. 2006). Because ERISA preemption is a defense, the defendant bears

the burden of showing that a plan does not meet the safe-harbor requirements. *Berry*, 2007 WL 1795837, at *4  (citing *Merrick v. Nw. Mut. Life Ins. Co.*, 2001 WL 34152095, at *7 (N.D. Iowa 2001). Here, defendants do not dispute that the second and fourth requirements are satisfied by the plan. Docket 11 at 7-10. Thus, the court discusses the first and third requirements.

### A.        Whether Sanford contributed to Clark's plan.

The first prong of the ERISA safe-harbor provision requires that the employer make no contributions to the plan. 29 C.F.R. § 2510.3-1(j)(1). Here, defendants contend that Sanford contributed to Clark's plan by (1) agreeing to pay 100% of Clark's premiums, (2) remitting premium payments to the insurer, and (3) securing disability policy features that were unavailable to employees outside of an employer-sponsored plan. Docket 70 at 3-6. Conversely, Clark argues that Sanford did not contribute to his plan because Clark paid the premiums and defendants failed to establish that the disability policy features were only available within an employer-sponsored plan. Docket 71 at 13-27. The court first addresses whether Sanford directly contributed to Clark's plan by paying any part of the premium.

### 1.        Did Sanford directly contribute to Clark's plan?

Defendants argue that Sanford agreed to pay 100% of the premiums for Clark's plan and Sanford remitted the premium payments to the insurer. Docket 70 at 3. Defendants point to Exhibit 15 (Docket 67 at 61) in support of their contention that Sanford paid 100% of the premiums. In Exhibit 15—the Employer Sponsored Multilife Agreement—Sanford checked a box noting that it would "pay in full the required premiums (100% Employer Pay) to such policies and to remit such premiums to the Insurance Company when due." Docket 67 at 61. Defendants also point to Exhibit 4 (Docket 67 at 8) and testimony from Fournier for the proposition that if Sanford failed

to remit payment of premiums to the insurance company in a timely manner, then the policy could lapse for nonpayment of premiums. Docket 69 at 25. Finally, defendants rely on Clark's IDI policy application where he checked boxes indicating that 100% of the requested coverage premiums would be paid by Sanford, Sanford's contribution would be included in his taxable income, and notices should be sent to Sanford. Docket 67 at 18.

Clark counters that the premiums were paid by payroll deduction from Clark's pay, which does not constitute a contribution by the employer. Docket 71 at 13-15. Clark also argues that, while Sanford may have remitted the premium payments to the insurer via payroll deduction, the payment for the premiums came from his taxable income, and, thus, he actually paid the premiums. *Id.* at 15-19.

At the outset, Clark is correct that if Sanford remitted premium payments to the insurer via payroll deduction from the employee, it would not trigger the application of ERISA under the safe-harbor provision. 29 C.F.R. § 2510.3-1(j)(3). Thus, Sanford merely remitting premium payments to the insurer by payroll deduction does not constitute an employer contribution. The question then is whether Sanford or Clark actually paid the premiums on Clark's policy.

One way to establish who actually paid premiums is to determine whether Sanford treated the payroll deductions as part of Clark's taxable income, or whether the payroll deductions did not reduce Clark's taxable income. *See Berry*, 2007 WL 1795837, at *4 (citing *Cowart v. Metro. Life Ins. Co.*, 444 F. Supp. 2d 1282 (M.D. Ga. 2006)). If the premiums were treated as part of Clark's taxable, gross income, then it follows that Clark paid the premiums. *See id.*; 26 U.S.C. § 104(a)(3); 26 C.F.R. § 1.104-1(d). Additionally, if premium payments are included in an employee's taxable income, then any benefits received under the policy are non-taxable. 26 U.S.C. § 104(a)(3); 26

5

C.F.R. § 1.104-1(d); *see also* Docket 69 at 51 (Fournier noting that, if an employee pays premiums and pays taxes on premiums, then benefits are non-taxable).

Here, defendants admit that, in Clark's policy application, Clark noted that the premiums paid on his behalf would be included in his taxable income. Docket 14 ¶ 14. Unum's own analysis of Clark's policy also determined that any benefits Clark may receive are non-taxable. Docket 68 at 56. In a questionnaire from defendants, Sanford noted that: (1) it does not pay any portion of Clark's IDI policy premiums, (2) it does not allow Clark to pay any portion of his premiums through pre-tax dollars, meaning he pays the premiums with taxable income; and (3) none of Clark's IDI policy benefits are taxable. *Id.* at 115. Further, defendants' billing system notes that there are no employer contributions to Clark's plan. *Id.* at 96. Finally, Clark's earnings statements show monthly withholdings of $245.18 under code 09. *Id.* at 62-66. Code 09 is listed as a deduction that does not reduce taxes. *Id.* at 67. The $245.18 withholding accounts for the premium payments for Clark's Paul Revere policy and a second policy through The Lincoln National Life Insurance Company. *See id.* at 120 (describing second policy); Docket 1 ¶ 91 (same); Docket 69 at 92-94 (accounting for Clark's payroll deduction). Clark has presented convincing evidence that he actually paid the premiums on his Paul Revere policy.

In the face of evidence that Clark actually paid the premiums on his policy, defendants rely only on conclusory statements from Exhibits 4, 6, and 15, and Fournier's statement that Sanford would be responsible for premium payment and that nonpayment by Sanford could result in lapse of Clark's policy. Defendants' evidence fails to persuade the court that Sanford actually paid Clark's premiums. Instead, the court finds Clark's evidence, specifically, admissions from Sanford that it does not pay any portion of Clark's premiums, to be convincing. Thus, the court finds

that Clark paid the policy premiums and Sanford did not directly contribute to his plan.

### 2.    Did Sanford indirectly contribute to Clark's plan?

Defendants next argue that Sanford contributed to Clark's plan because Sanford's employees "obtained disability policies with features unavailable outside of an employer-sponsored plan." Docket 70 at 4. These features include a premium discount, guaranteed standard issue, modified guaranteed issue, guaranteed coverage increases, preferential underwriting, and an annual premium increase. *Id.* at 4-6. Clark contends that: (1) the automatic premium discount is not a contribution by Sanford, (2) Sanford did not negotiate premium payments, and (3) there is no evidence that the various features were only available through an employer-sponsored plan. Docket 71 at 19-27.

In its order denying partial summary judgment, the court previously declined to adopt a rule that any discount, whether negotiated or offered as a matter of course, is a contribution under the safe-harbor provision. Docket 27 at 8. Here, defendants again argue that, where a discounted premium is based on an employer's negotiation of the plan, involvement in remitting premium payments, or grouping of employees on a single bill, then the employer has contributed to the plan. Docket 70 at 4. Defendants again rely on *Healy v. Minn. Life Ins. Co.*, 2012 WL 566759 (W.D. Mo. Feb. 21, 2012), in support of this proposition. *Id.* Defendants contend that Clark only received a premium discount because of Sanford's involvement in obtaining coverage. *Id.* But the evidence of the discount itself appears to be standard marketing material provided by Unum Group when it educates employers on various plans. Docket 67 at 10. As was the case in the court's previous order denying partial summary judgment, defendants failed to present convincing evidence that Sanford negotiated the premium

7

discount for Clark's benefit. Thus, the 20% premium discount, standing alone, is not an employer contribution.

Defendants next argue that the guaranteed standard issue feature—the amount of monthly benefit an employee could receive without medical underwriting—was only available to Clark "through [the] employer-sponsored plan[][,]" and is an employer contribution. Docket 70 at 4; *see also* Docket 69 at 67. Defendants rely on Fournier's testimony for that proposition. Docket 70 at 4. But Fournier did not testify that the guaranteed standard issue was only available to employees under an employer *sponsored* plan, she testified that "[t]his type of guaranteed plan would only be available to an employer *group* with eligible employees." Docket 69 at 18 (emphasis added). The fact that Clark purchased his Paul Revere policy alongside other employees of Sanford—i.e., members of an employer group—is expressly permitted under ERISA's safe-harbor provision. *See* 29 C.F.R. § 2510.3-1(j).[3] Defendants do not point to any other evidence that they negotiated this policy feature for Clark. On the evidence before the court, defendants have not carried their burden to show that the guaranteed standard issue feature is an employer contribution to Clark's plan.

Defendants also contend that Sanford contributed to Clark's plan because a modified guarantee issue feature was included in the plan. Docket 70 at 4. Fournier described the modified guarantee issue as a feature where coverage cannot "be denied but could be modified in issues other than has been applied for . . . with a rating or

---

[3] Under the "sole function" prong of ERISA's safe-harbor provision, an employer may permit an insurer to publicize the group insurance program to employees, collect premiums via payroll deductions, and remit those payments to the insurer without removing a plan from the safe-harbor provision. 29 C.F.R. §2510.3-1(j)(3). Thus, merely receiving a feature as part of an employee group, or through the employer as defendants put it, does not mean that the employer contributed to the plan. Such an interpretation would render the "sole function" prong of the safe-harbor provision meaningless.

possible exclusion based on questions answered on the application and medical information reviewed." Docket 69 at 27-28. Defendants rely on Fournier's testimony to argue that this feature "was only available to employees of an employer sponsored group plan[.]" Docket 70 at 5. As with the guaranteed standard issue feature, Fournier testified that "[n]othing of this type of arrangement would be allowed to anyone other than if they're part of an employer group." Docket 69 at 67. Again, defendants do not point to any evidence in the record that Sanford negotiated this feature for Clark. Instead, the inference the court draws is that this feature was included in all employer groups once the employer group reached a certain number of insureds in the group. Considering a policy feature given to members of an employer group, without any evidence of employer involvement in obtaining the feature, a contribution under the safe-harbor provision would undercut the purpose of the "sole function" prong. Thus, the court finds that the inclusion of the modified guarantee issue feature is not a contribution by Sanford to Clark's plan.

Defendants next argue that the inclusion of the guaranteed coverage increase feature in Clark's plan is an employer contribution. Docket 70 at 5. For similar reasons that the court does not find that the inclusion of the guaranteed standard issue and modified guarantee features were contributions by Sanford to Clark's plan, the court also does not find that the inclusion of guaranteed coverage increases are a contribution by Sanford. Fournier testified that the guaranteed coverage increase feature "is an extra contractual arrangement for an *employer group* to allow for increases to the monthly benefit based on income eligibility." Docket 69 at 18 (emphasis added). Fournier later testified that this feature was only available to an employer-sponsored group, but Fournier's answer was in response to a leading question from defense counsel. *See id.* at 19. Like the previous features discussed, the

9

court finds that they were offered to an employer group, as Fournier originally testified, based on the number of insureds in the employer group rather than based on any negotiation by Sanford. This benefit would have been available to any employer group that reached the specified group size. Thus, the guaranteed coverage increase feature was not a contribution by Sanford to Clark's plan.[4]

Finally, defendants argue that "[a]pplicants for individual policies offered through employer sponsored plans were not subject to full underwriting." Docket 70 at 5. Defendants again rely on Fournier's testimony for this proposition. *Id.* Fournier testified that the guaranteed standard issue feature is essentially preferential underwriting because "[m]edical questions are not weighed in as much of a factor for a [guaranteed standard issue] group, which would be based on income and not solely on medical. . . For the guaranteed standard issue . . . [i]t would be guaranteed coverage." Docket 69 at 19-20. The court previously determined that the guaranteed standard issue feature was offered to all insureds that were part of an employer group. There is no evidence that Sanford did anything for Clark to receive this benefit. Thus, the preferential underwriting is not a contribution by Sanford to Clark's plan.

Clark, not Sanford, paid the premiums for Clark's Paul Revere policy. Sanford merely remitted the premium payments to defendants via payroll deduction from

---

[4] Defendants also argue that the annual premium increase constituted an employer contribution. Docket 70 at 6. Defendants point to Exhibit 7 (Docket 67 at 45), which is a Policy Change Bill reflecting the premium increase that was sent to a broker rather than Clark. Docket 67 at 45; *see also* Docket 69 at 31-32. Fournier testified that the premium increase is tied to the guaranteed coverage increase. Docket 69 at 32. The court found that the guaranteed coverage increase was not an employer contribution, thus, the premium increase tied to the guaranteed coverage increase is also not an employer contribution. Defendants highlight that Exhibit 7 was not sent to Clark. Docket 70 at 6. But the premium increase would not be sent to Clark because he did not remit premium payments to the insurer.

Clark's taxable income. As a result, Sanford did not directly contribute to Clark's plan. Further, the features included in Clark's policy were not negotiated by Sanford, rather, they were included because Clark was part of an employer group, which is expressly permitted under ERISA's safe-harbor provision. Thus, the court finds that Sanford did not contribute to Clark's plan under ERISA's safe-harbor provision.

> **B.     Whether Sanford exceeded the "sole function" requirement.**

The third prong of ERISA's safe-harbor provision requires that:

> The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer[.]

29 C.F.R. § 2510.3-1(j)(3). Defendants argue that Sanford's function exceeded the "sole function" requirement. Docket 70 at 6-10. Defendants assert that Sanford, and various Sanford brokers, discussed initial plan features, updates and renewals. *Id.* Clark raises several arguments to refute that Sanford's involvement with his plan exceeded the "sole function" requirement. Docket 71 at 24-37.

> **1.     Did Sanford's purported involvement concerning initial plan features exceed the "sole function" prong?**

Defendants contend that Sanford was involved in discussions with Paul Revere concerning initial plan features. Docket 70 at 6-7. Defendants first point to Exhibit 1 (Docket 67 at 1-3) as evidence of communications between Paul Revere underwriters and broker MCG in 1997 establishing a "reverse combo" coverage feature, coordination of individual and group disability coverage, and discussions about a census prepared by MCG for the employer group. Docket 70 at 6. Clark argues that discussions between Paul Revere underwriters and broker MCG do not equate to actions by Sanford that exceed the "sole function" criteria. Docket 71 at 27-28. Clark further

asserts that his individual policy was not issued in combination with the ERISA controlled group disability policy owned by Sanford. *Id.* at 28-29.

Here, defendants refer to a "reverse combo" coverage feature, involving coordination of individual and group disability coverage, where coverage based on an individual disability policy comes first, followed by long term disability coverage. Docket 70 at 6. Clark's claim file notes that his individual policy is not part of a combination group/individual purchase. Docket 68 at 80. Nothing in Exhibit B, the group insurance policy owned by Sanford, refers to any individual policies. *See id.* at 22-54. Likewise, nothing in Clark's individual policy refers to the group policy owned by Sanford; instead, Clark's policy contains integration clauses in two locations noting that the policy, the application, policy schedule, and any attached papers make up the entire contract between Clark and Paul Revere. *Id.* at 7, 14. The group policy is not an attached paper. Thus, Clark's policy does not appear to be a part of this "reverse combo" coverage feature.

Exhibit 1 illustrates communications between Paul Revere underwriters and broker MCG offering a coverage plan for Sanford employees. Docket 67 at 1-3. The facsimile cover sheet notes that it is from Rob Kistler to Charlie Havens or Tim McGunnigle. *Id.* at 1. Kistler's title is listed as an administrative assistant at MCG and Havens' title is listed as advanced underwriting and selection management at Paul Revere. *See id.* at 2. The cover sheet also lists Paul Revere, not Sanford, as the client. *Id.* at 1. Defendants, not Sanford, paid the broker a commission. *See* Docket 69 at 72. Based on Exhibit 1, MCG acted as a broker for Paul Revere, not Sanford. Thus, it does

not appear that Sanford had any involvement in communications with Paul Revere to establish the plan and Sanford did not exceed the "sole function" prong.[5]

Defendants next point to Exhibits 2 and 3 (Docket 67 at 4-7), which are internal emails from 1997 that defendants allege "discuss plan features in conjunction with the individual policies." Docket 70 at 7. Exhibit 2 is a November 17, 1997, email from Lisa Principe to Sherri Schug. Docket 67 at 4. The subject line reads "Sioux Valley Health Systems," which would later become Sanford. *Id.* The email discussed plan details. *Id.* Fournier testified that both Principe and Schug worked for Paul Revere. Docket 69 at 16. Sanford does not appear to have any involvement in this email. Exhibit 3 also appears to be internal emails from Paul Revere employees Schug, Principe, and Havens discussing the Sanford plan. *See* Docket 67 at 5-7. Again, Sanford was not involved in this email. Both emails do nothing to illustrate that Sanford exceeded the "sole function" prong in regard to Clark's policy.

Finally, defendants contend that Exhibit 4 (Docket 67 at 8-12) "detailed 'Discounts and Optional Payment Plans' offered to employers at the time Sanford established the plan." Docket 70 at 7. Exhibit 4 is a grid where discounts and payment plans change based on the number of insureds. *Id.* at 8. Exhibit 4 does not establish that Sanford did anything that would take its role outside of the "sole function" prong. Rather, Exhibit 4 appears to be standard marketing material used by

---

[5] Defendants argue that Exhibits 12 and 13 confirm the agency relationship between the broker and Sanford. Docket 73 at 9. Both exhibits are letters from underwriting specialists at Provident Life and Accident Company to Clark Consulting noting that Clark had recently submitted a census of employees on behalf of Sanford in order to increase the employee's base benefits. Docket 67 at 54-55. Defendants did not introduce any evidence to explain how Clark Consulting's actions are imputed upon MCG such that MCG became Sanford's broker. Thus, the court finds that Clark Consulting's actions are irrelevant in relation to MCG's actions regarding Exhibit 1.

defendants to educate employers. Thus, the court finds that Sanford did not exceed the sole function prong when the initial plan was established.

> **2.    Did Sanford's purported involvement in modifying and updating the plan exceed the "sole function" prong?**

Defendants next argue that "[s]ubsequent to issuance of [Clark's] policy, Sanford obtained and at least considered modifications to the plan offering individual disability policies to employees." *Id.* at 7. Defendants first point to Exhibit 8, which is a July 15, 2002, email chain that discusses reducing the elimination period from 180 days to 90 days. Docket 67 at 46. Defendants do not provide any evidence that this proposal would have applied to Clark's individual plan, nor that the proposal ever went into effect. Instead, defendants admit that this proposal would not have impacted Clark directly. Docket 70 at 7.

Defendants also point to Exhibit 9 as evidence of Sanford discussing plan design related to salaries of employees. *Id.* Exhibit 9 appears to be an email chain between employees at Clark Consulting and an employee at Unum Provident seeking clarification on the disability compensation formula for the physician group. Docket 67 at 47. Fournier testified that Clark received his individual policy under this physician group. Docket 69 at 35. But merely seeking clarification on the compensation formula does not exceed the "sole function" prong; rather, it appears to be a ministerial task that assists the insurer in publicizing the program to Sanford employees. *See Gooden v. Unum Life Ins. Co. of Am.*, 181 F. Supp. 3d 465, 476 (E.D. Tenn. 2016) (citing *Thompson v. Am. Home Assurance Co.*, 95 F.3d 429, 436 (6th Cir. 1996)).

The same can be said for Exhibits 10, 12, and 13, which defendants also argue are evidence that Sanford exceeded the "sole function" prong. Docket 70 at 7. Exhibit 10 is another email chain between Clark Consulting employees and Unum Provident employees. Docket 67 at 48. Exhibit 10 suggests an increase to the guaranteed

standard issue amount based on the number of insureds in the group. *Id.* It is unclear if Exhibit 10 applied to Clark's policy. *See* Docket 69 at 35. Exhibits 12 and 13 discuss a census provided by Clark Consulting on Sanford's behalf to defendants. Docket 67 at 54-55. The census is used to determine an employee's base benefit. *Id.* These exhibits represent ministerial tasks that help to accurately publicize the program to Sanford employees, and it is unclear if they even applied to Clark's policy.

Defendants further contend that Exhibit 11 is evidence that Sanford exceeded the "sole function" requirement. Docket 70 at 8. Exhibit 11 is a renewal letter from Unum Provident to Clark Consulting setting out revised eligibility, plan design, and other related information. Docket 67 at 50-53; Docket 70 at 8. It does not appear that Sanford had any involvement in negotiating plan design or eligibility based on Exhibit 11, nor do defendants explain how Exhibit 11 illustrates how Sanford exceeded the "sole function" prong.

Defendants next point to Exhibit 14, a Supplemental Income Protection Plan dated February 21, 2007, as evidence that Sanford exceeded the "sole function" prong. Docket 70 at 8. Fournier testified that nothing in Exhibit 14 would have changed Clark's already in-force individual policy. Docket 69 at 90. Thus, the court does not find Exhibit 14 relevant to the question of whether Sanford exceeded the "sole function" prong as it relates to Clark's plan.

Defendants next argue that Exhibit 15, the Employer Sponsored Multilife Agreement, is evidence that Sanford exceeded the "sole function" prong. Docket 70 at 9. Defendants contend that, under the Employer Sponsored Multilife Agreement dated February 5, 2007, Sanford agreed to pay the premiums for Paul Revere, Provident Life, and Unum policies. *Id.* Here, it is unclear from Exhibit 15 whether Clark's policy is covered by the Employer Sponsored Multilife Agreement because the agreement does

15

not specifically refer to covered policies. *See* Docket 67 at 61. Further, the court previously determined that Clark, not Sanford, paid the premiums on his policy. *See supra* Discussion I.A.1. Even assuming the Employer Sponsored Multilife Agreement applied to Clark's plan, Sanford withdrew from the agreement on December 3, 2008. Docket 67 at 62. Defendants contend that Sanford's withdrawal from the Employer Sponsored Multilife Agreement does not affect the application of ERISA, relying on *Painter v. Golden Rule Ins. Co.*, 121 F.3d 436 (8th Cir. 1997).

In *Painter,* plaintiff held a group disability policy that was part of an employee welfare benefit plan governed by ERISA. 121 F.3d at 438. Plaintiff was terminated by her employer, and she exercised her "health insurance conversion privilege" under the ERISA group policy and purchased an individual conversion policy from the group policy insurer. *Id.* After the insurer denied her claim for benefits, plaintiff alleged state-law claims of malicious prosecution and breach of fiduciary duty against the insurer. *Id.* The Eighth Circuit held that the employee's claim for benefits under the conversion policy was governed by ERISA because the conversion policy came into being as a result of the employee "exercising her right under the group policy to obtain [the conversion] policy. Thus, the right to a Conversion Policy was part of a plan or program" established by her employer. *Id.* at 439-40. Unlike *Painter*, Clark's claim does not arise from a conversion policy that arose out of an ERISA policy. Rather, Clark's claim for benefits arises from his individual policy that was issued well before Sanford entered into the Employer Sponsored Multilife Agreement, and Clark's claim arose from events occurring well after Sanford withdrew from the Employer Sponsored Multilife Agreement. Thus, the court does not find that Sanford's participation in the Employer Sponsored Multilife Agreement exceeded the "sole function" prong.

16

Finally, defendants contend that "Sanford's management of the plan was so seamless and all-encompassing that [Clark] was unaware of the Policy until advised during his review of his 'Benefits Package' at the time of his claimed disability." Docket 70 at 9. Defendants point to letters from Clark where he states he was unaware of his coverage under the policy at issue until he was advised by Sanford's Physician Benefit Administrator—Pat Tripp—that the policy was in force. *Id.*; Docket 67 at 91; Docket 68 at 120. The court does not find that this evinces Sanford exceeding the "sole function" prong. Instead, it would make sense that Tripp would be aware of the policy because Sanford had been deducting the premium payments for the policy from Clark's pay and remitting them to the insurer.

The court finds that Sanford's alleged involvement in establishing Clark's plan did not exceed the "sole function" prong. The court also finds that Sanford's alleged involvement in modifying and updating the plan did not exceed the "sole function" prong. Because the court previously found that Sanford did not contribute to Clark's plan, the court further finds that ERISA's safe-harbor provision applies to Clark's plan.

## II.  Whether the Plan is an "Employee Benefit Plan" that was "Established or Maintained" by Sanford.

Because the court finds that ERISA's safe-harbor provision applies, it does not address whether the plan is an "Employee Benefit Plan."

### CONCLUSION

Defendants failed to carry their burden to show that Sanford contributed to Clark's plan. Further, defendants failed to carry their burden to show that Sanford exceeded the "sole function" prong. Because defendants have not carried their burden, the court finds that ERISA's safe-harbor provision applies to Clark's plan and Clark's state-law claims are not preempted by ERISA. Thus, it is

17

ORDERED that Clark's alternative claims under ERISA (Docket 1 at 15-16) are dismissed. Clark's state-law claims survive.

DATED June 30, 2022.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE